Opinion
 

 SMITH, J.
 

 On February 20-21, 1980, Chevron Chemical Company discharged 3.5 million gallons of fertilizer process wastes and stormwater run off into Castro Creek, a tributary to Herman Slough on San Pablo Bay.
 

 Chevron entered into a settlement agreement on September 10, 1980, with the California Regional Water Quality Control Board, San Francisco Bay
 
 *52
 
 Region, paying $25,000 in full settlement of all monetary claims arising from the discharge. At the behest of a pollution warden for the California Department of Fish and Game, a criminal action was filed in municipal court on October 16, 1980, charging respondent Chevron Chemical Company with violation of Fish and Game Code section 5650, subdivision (f) (depositing substance deleterious to fish, plant life or bird life into state waters).
 

 The trial court, construing respondent’s “Motion Regarding Standard of Fault under Fish & Game Code § 5650” as a demurrer, sustained the demurrer with leave to amend. After judgment of dismissal was entered following the People’s failure to amend, appeal was taken to the appellate department of the superior court. The appellate department
 
 affirmed
 
 the trial court’s determination that proof of intent or negligence was necessary under Fish and Game Code section 5650, subdivision (f). The appellate department certified the case to this court because transfer appears necessary to settle an important question of law. (Cal. Rules of Court, rule 62.)
 

 The sole issue presented is one of statutory construction: Whether Fish and Game Code section 5650, subdivision (f) should be construed as a strict liability offense, or one which requires proof of criminal negligence or criminal intent.
 
 [1]
 

 Chevron contends that the construction of section 5650 is governed by Penal Code section 20 which provides: “To constitute crime there must be unity of act and intent. In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence.” Bolstering Penal Code section 20 is
 
 People
 
 v.
 
 Vogel
 
 (1956) 46 Cal.2d 798 [299 P.2d 850], wherein Justice Traynor, at page 801, referring to the union of act and intent, stated: “So basic is this requirement that it is an invariable element of every crime unless excluded expressly or by necessary implication.”
 

 The
 
 Vogel
 
 court continues, at page 801, footnote 2, to expand upon those circumstances where mens rea is excluded by necessary implication: “Under many statutes enacted for the protection of the public health and safety, e.g., traffic and food and drug regulations, criminal sanctions are relied upon even if there is no wrongful intent. These offenses usually involve light penalties and no moral obloquy or damage to reputation. Although criminal sanctions are relied upon, the primary purpose of the statutes is regulation rather than punish
 
 *53
 
 ment or correction.
 
 The offenses are not crimes in the orthodox sense, and wrongful intent is not required in the interest of enforcement.
 
 [Citations.]” (Italics added.)
 

 The exception recognized in
 
 Vogel
 
 is by no means a modem notion, but dates back to the 19th century. One of the first cases in England dispensing with the. requirement of mens rea involved a defendant who owned a quarry, and was criminally charged with a nuisance because his employees deposited stone and mbbish in a river adjacent to the quarry so that navigation was obstmcted. The court affirmed the conviction holding that “when a criminal offense is charged there must be
 
 mens rea\
 
 but it is manifest that there are a large class of cases in which it is unnecessary to prove a criminal intention;...”
 
 (Regina
 
 v.
 
 Stephens
 
 (1866) L.R. 1 Q.B. 702, 704.) Justice Mellor, in
 
 Stephens,
 
 at page 709, commented: “The object of this indictment is to prevent the recurrence of the nuisance.”
 
 Stephens
 
 relied upon
 
 Rex
 
 v.
 
 Medley
 
 (K.B. 1834) 6 Car. & P. 292 where the directors of a gas company were held strictly liable for discharging gas and other deleterious substances into the Thames River causing pollution and damage to the fishing industry.
 

 In more recent times, the California Supreme Court found mens rea unnecessary and upheld the conviction of a meat market proprietor for “short-weighting” in the sale of meat by his employee. The court noted that “ ‘where qualifying words such as knowingly, intentionally, or fraudulently are omitted from provisions creating the offense it is held that guilty knowledge and intent are not elements of the offense. ’ ” The court went on to quote from an Ohio case which stated the basic principle: “ ‘There are many acts that are so destructive of the social order, or where the ability of the state to establish the element of criminal intent would be so extremely difficult if not impossible of proof, that in the interest of justice the legislature has provided that the doing of the act constitutes a crime, regardless of knowledge or criminal intent on the part of the defendant.’”
 
 (In re Marley
 
 (1946) 29 Cal.2d 525, 529 [175 P.2d 832].)
 

 This principle, that strict liability is appropriate in regulatory offenses, has been followed in construing a variety of regulatory statutes:
 
 Aantex Pest Control Co.
 
 v.
 
 Structural Pest Control Bd.
 
 (1980) 108 Cal.App.3d 696 [166 Cal.Rptr. 763] (use of unlicensed poison);
 
 People
 
 v.
 
 Travers
 
 (1975) 52 Cal.App.3d 111 [124 Cal.Rptr. 728] (sale of improperly branded motor oil);
 
 Brodsky
 
 v.
 
 Cal. State Bd. of Pharmacy
 
 (1959) 173 Cal.App.2d 680 [344 P.2d 68] (liability of pharmacist for compounding of prescriptions by unlicensed person).
 

 Justice Traynor, in
 
 Vogel,
 
 enunciated the well-recognized
 
 public welfare offenses
 
 exception to the mens rea requirement in criminal prosecution. These public welfare crimes are most often based upon the violation of statutes purely
 
 *54
 
 regulatory in nature and involving widespread injury to the public. (See Sayre,
 
 Public Welfare Offenses
 
 (1933) 33 Colum.L.Rev. 55 et seq.)
 

 This court cannot agree with Chevron’s insistence that section 5650 be construed to require proof of scienter or criminal negligence. Section 5650 on its face does not require such proof. What is more important, however, is that the subject matter of this statute—the prevention of adverse impacts upon California’s fish, plant life or bird life through water pollution—is clearly within the regulatory
 
 public welfare
 
 exception to the criminal prosecution mens rea requirement.
 

 Next, Chevron argues that section 5650 should be construed to require criminal intent or criminal negligence so that it may be brought into harmony with the Water Code, specifically section 13350.
 
 [2]
 
 As stated in
 
 Merrill
 
 v.
 
 Department of Motor Vehicles
 
 (1969) 71 Cal.2d 907, 918 [80 Cal.Rptr. 89,458 P.2d 33]: “[A] statute should be construed with reference to the entire statutory system of which it forms a part in such a way that harmony may be achieved among its parts. ...” The
 
 Merrill
 
 rule is a statement of the canon of statutory construction that statutes
 
 in pari
 
 materia—statutes dealing with the same subject as the one being construed—are a relevant source of aid in construing the statute in question. (See 2A Sutherland, Statutory Construction (4th ed. 1973) § 51.01 et seq.)
 

 The real issue, therefore, is whether Fish and Game Code section 5650 and Water Code section 13350 are
 
 in pari materia
 
 and part of one statutory scheme.
 

 In support of the contention that the sections are
 
 in pari materia,
 
 and that section 5650 therefore requires proof of mens rea, Chevron cites
 
 People
 
 ex rel.
 
 *55
 

 Younger
 
 v.
 
 Superior Court
 
 (1976) 16 Cal.3d 30 [127 Cal.Rptr. 122, 544 P.2d 1322]. In
 
 Younger
 
 the court held that clause (3) of subdivision (a) of section 13350, although silent in this regard, requires proof of intent or criminal negligence because the other two clauses of the same subdivision of the same statute so require. Chevron asks us to use the
 
 Younger
 
 holding to read into section 5650 a section 13350 mens rea requirement, despite the fact that the two sections were enacted decades apart.
 
 [3]
 

 First, respondent’s argument misses the
 
 Younger
 
 court’s own view of its task. The court itself stated: “The problem of statutory construction which we
 
 face focuses more upon the structure of the relevant provisions than their meaning.
 
 ” (People ex rel.
 
 Younger
 
 v.
 
 Superior Court, supra,
 
 16 Cal.3d 30, 40; italics added.)
 

 Second, the history of section 5650, subdivision (f), and its predecessor section indicates that at enactment in 1875, and at each of the eight subsequent amendments, the language became more inclusive, but at no time was there a mens rea requirement. The Legislature had nine opportunities to require proof of scienter or criminal negligence and in each instance declined to do so.
 

 We must decline Chevron’s urgings to read into an 1872
 
 criminal
 
 statute the words “intentionally or negligently” from a statute providing for
 
 civil
 
 liability which was enacted in 1969 and amended in 1971.
 

 In
 
 People
 
 v.
 
 Union Oil Co.
 
 (1968) 268 Cal.App.2d 566, 570 [74 Cal.Rptr. 78], the court considered whether passage of the Dickey Act, the predecessor of Porter-Cologne, superseded Fish and Game section 5650 so as to preclude any criminal prosecution. The court held that civil proceedings under the Water
 
 *56
 
 Code “were intended to supplement, not supplant criminal proceedings under [section 5650].” The court in
 
 Union Oil
 
 took note of the fact that when the Legislature enacted the Dickey Act, it did not change the language of Fish and Game Code section 5650.
 
 {Ibid.)
 

 This court, in like manner, notes that once again no changes were made to Fish and Game Code section 5650 when the Porter-Cologne Act was adopted in 1969. We can find in Water Code section 13350
 
 no
 
 manifestation of a legislative intent to eliminate or change the criminal sanctions provided for under the Fish and Game Code.
 

 Extensive studies preceded the enactment of the Porter-Cologne Act. (See California State Water Resources Control Board, “Recommended Changes in Water Quality Control, Final Report of the Study Panel” (1969).) Furthermore, we are mindful of the doctrine that when the Legislature enacts new legislation, the Legislature is (1) presumed to envision the whole body of law on the subject matter, and (2) presumed to have expressly designated any repeal of prior provisions, xather than to leave a repeal to arise by necessary implication. (1A Sutherland, Statutory Construction,
 
 supra,
 
 § 23.10 at p. 231.)
 

 We reject Chevron’s urgings that Fish and Game Code section 5650 and Water Code section 13350 are
 
 in pari materia,
 
 or part of one statutory scheme, and must be harmonized by reading a mens rea requirement into section 5650. These are separate and distinct sections—from different codes, passed 93 years apart, one criminal and the other civil, and with different albeit similar goals. The mere commonality of “water” is not enough for this court to read into section 5650 a mens rea requirement. We therefore hold that Fish and Game section 5650 is a strict liability statute which requires no proof of either intent or criminal negligence.
 

 In view of our holding, it was error for the municipal court to sustain respondent’s demurrer and to enter a judgment of dismissal.
 

 The judgment of the municipal court is reversed.
 

 Kline, P. J., and Rouse, J., concurred.
 

 A petition for a rehearing was denied June 17, 1983.
 

 [1]
 

 Fish and Game Code section 5650, subdivision (f) provides as follows: “It is unlawful to deposit in, permit to pass into or place where it can pass into waters of this State any of the following: ...(f) any substance or material deleterious to fish, plant life or bird life.”
 

 The maximum penalty for violation of Fish and Game Code section 5650, subdivision (f), a misdemeanor, is $500 or imprisonment in the county jail for six months, or both. (Fish & Game Code, §§ 12000 and 12002.)
 

 [2]
 

 Water Code section 13350 reads in part as follows: “(a) Any person who (1) intentionally or negligently violates any cease and desist order hereafter issued, reissued, or amended by a regional board or the state board, or (2) in violation of any waste discharge requirement or other order or prohibition issued, reissued, or amended by a regional board or the state board, intentionally or negligently discharges waste or causes or permits waste to be deposited where it is discharged, into the waters of the state and creates a condition of pollution or nuisance, or (3) causes or permits any oil or any residuary product of petroleum to be deposited in or on any of the waters of the state, except in accordance with waste discharge requirements or other provisions of this division, may be liable civilly in a sum of not to exceed six thousand dollars ($6,000) for each day in which such violation or deposit occurs.”
 

 Water Code section 13350 was enacted in 1969 as part of the Porter-Cologne Act, which revised the Dickey Act enacted in 1949. Under the Dickey Act, proof of pollution required a showing of an
 
 actual adverse effect
 
 on beneficial uses of water. The Porter-Cologne Act requires no showing of adverse effects from pollution, thus permitting enforcement actions against polluters
 
 before
 
 there is adverse impact on state waters.
 

 In general terms, the Porter-Cologne Act strengthened remedies against violators in furtherance of a public policy aimed at preservation and protection of the state’s valuable water resources. (See Robie,
 
 Water Pollution: An Affirmative Response by the California Legislature
 
 (1970) 1 Pacific LJ. 2.)
 

 [3]
 

 Section 5650 of the Fish and Game Code is similar to section 481 of the Fish and Game Code of 1933 (Stats. 1933, ch. 73, § 481, p. 440), which in turn was derived from former Penal Code section 635, enacted by Statutes 1875-1876, chapter 457, section 2, page 115, which stated: “Every person who places, or allows to pass into any waters of this State, any lime, gas, tar, cocculus indicus, or any other substance deleterious to fish, is guilty of a misdemeanor.”
 

 The 1889 amendment added sawdust to the list of proscribed substances. The 1895 amendment enlarged the list of proscribed discharges to include “shavings, slab edgings, mill or factory refuse. ” In 1897, the Legislature prohibited the use of explosives in the state waters for the purpose of killing or taking fish. In 1901 “slag” was added to the list of proscribed substances. The 1903 amendment required that fines collected be deposited in a “fish commission fund.” In 1915 the list of proscribed substances was again enlarged to include “petroleum, acid, coal or oil tar, lamp black, analine, asphalt, bitumen, or residuary product of petroleum or carbonaceous material, or substance, or any refuse, liquid or solid from any oil refinery, gas house, tannery, distillery, chemical works, mill or factory of any kind,” and also prohibited discharges or deposits which were deleterious to plant life as well as fish life. In 1921 materials deleterious to bird life were also proscribed. The 1927 amendment made no substantive change.
 

 Section 5650 of the Fish and Game Code remains essentially unchanged from the 1927 version in the area of water pollution affecting fish, bird, and plant life.
 

 Water Code section 13350 was added by Statutes 1969, chapter 482, section 18, page 1070 and was amended by Statutes 1971, chapter 668, section 1, page 1322.